# IN THE CIRCUIT COURT FOR
## ANNE ARUNDEL COUNTY, MARYLAND

CITY OF ANNAPOLIS,                          Civil Action No.:
MARYLAND,
A Municipal Corporation and Public
160 Duke of Gloucester Street
Annapolis, MD 21401

                            Plaintiff,

       v s .

PURDUE PHARMA L.P.
One Stamford Forum
201 Tresser Boulevard
Stamford, CT 06901

PURDUE PHARMA, INC.
One Stamford Forum
201 Tresser Boulevard
Stamford, CT 06901

THE PURDUE FREDERICK
COMPANY
One Stamford Forum
201 Tresser Boulevard
Stamford, CT 06901

TEVA PHARMACEUTICALS USA,
INC.
1090 Horsham Road
North Wales, PA 19454

CEPHALON, INC.
1090 Horsham Road
North Wales, PA 19454

JOHNSON & JOHNSON
1 Johnson And Johnson Plaza
New Brunswick, NJ 08933

JANSSEN  PHARMACEUTICALS,
INC.;  ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS,  INC.  n/k/a
JANSSEN PHARMACEUTICALS,

INC.; JANSSEN PHARMACEUTICA,
INC. n/k/a JANSSEN
PHARMACEUTICALS, INC.
1125 Bear Tavern Road
Titusville, NJ 08560

ENDO HEALTH SOLUTIONS INC.
1400 Atwater Drive
Malvern, PA 19355

ENDO PHARMACEUTICALS, INC.
c/o The Corporation Trust Incorporated
300 E. Lombard Street
Baltimore, MD 21202

INSYS THERAPEUTICS, INC.
1333 South Spectrum Boulevard
Suite 100
Chandler, AZ 85286

CARDINAL HEALTH, INC.
c/o CT Corporation System
4400 Easton Commons, Suite 125
Columbus, OH 43219

MCKESSON CORPORATION
c/o CSC-Lawyers Incorporating Service
Company
7 Saint Paul Street, Suite 820
Baltimore, MD 21202

AMERISOURCEBERGEN DRUG
CORPORATION;
c/o The Corporation Trust, Inc.
2405 York Road, Suite 201
Lutherville Timonium, MD 21093

WILLIAM THAM, M.D.
789 Sonne Drive
Annapolis, MD 21401

PHYSICAL MEDICINE AND PAIN
MANAGEMENT ASSOCIATES, P.C.
c/o William Tham, M.D.
2002 Medical Parkway, Suite 430
Annapolis, MD 21401

KOFI SHAW-TAYLOR
2631 Green Briar Lane
Annapolis, MD 21401

HAPPINESS AGUZIE
8933 Greens Lane
Randallstown, MD 21133

TORMARCO HARRIS
107 Louis Drive
Annapolis, MD 21401

MINNIE NDEM
5937 Sandy Ridge
Elkridge, MD 21075

STARLIFE WELLNESS CENTER LLC
c/o Tormarco Harris
9 South Crain Hwy
Glen Burnie MD 21061

LAWRENCE VIDAVER, M.D.
1414 North Crain Hwy, Suite 6A
Glen Burnie, MD 21061

MARYLAND HEALING WATERS,
LLC f/k/a MARYLAND HEALING
WATERS LLC
c/o Lawrence Vidaver
2506 Larryvale Road
Baltimore, MD 21209

Defendants.

# COMPLAINT
## Jury Trial Requested

1.      Plaintiff City of Annapolis ("City") brings this action pursuant to its statutory

authority, to redress Purdue Pharma, L.P.'s, Purdue Pharma, Inc.'s, the Purdue Frederick

Company's, Teva Pharmaceuticals USA's, Cephalon, Inc.'s, Janssen Pharmaceuticals,

Inc.'s, Ortho-McNeil-Janssen Pharmaceuticals, Inc.'s, Janssen Pharmaceutica Inc.'s, Endo

Health Solutions Inc.'s, Endo Pharmaceuticals Inc.'s, (together, "Manufacturing

Defendants") and Insys Therapeutics, Inc.'s ("Defendant Insys") campaign of unfairly,

deceptively, and fraudulently marketing and promoting opioids, to redress McKesson

Corporation's, AmerisourceBergen Drug Corporation's, and Cardinal Health, Inc.'s

(together "Distributor Defendants") unfettered distribution of opioids into the City, and to

redress Kofi Shaw-Taylor's, Happiness Aguzie's, Minnie Ndem's, and Starlife Wellness

Center LLC's widespread dissemination of opioids through their operation of pill mills in

the area in and surrounding the City of Annapolis, William Tham's and Physical Medicine

& Pain Management Associates P.C.'s participation in the Insys kickback scheme and

excessive and improper prescribing of Subsys in the area in and around the City, and

Lawrence Vidaver's, Maryland Healing Waters, LLC's, Jackie Syme's, and Arundel

Neurology's excessive and improper prescribing of opioids in the area in and around the

City. These Defendants created a public nuisance, violated Maryland's Antitrust Act,

Maryland's Consumer Protection Act, Md. Code Ann., Com. Law § 13-101, *et seq.*

violated Maryland's False Claims Act, Md. Code Ann., Gen. Prov. § 8-101, *et seq.* made

fraudulent and negligent misrepresentations, were negligent and grossly negligent, and

were unjustly enriched.

2.      Defendants Purdue Pharma, L.P., Purdue Pharma Inc., and the Purdue Frederick

Company (collectively "Purdue"), Teva Pharmaceuticals USA, Inc. and Cephalon, Inc.

(collectively, "Teva"), and Janssen Pharmaceuticals, Inc. and Ortho-McNeil-Janssen

Pharmaceuticals, Inc., Janssen Pharmaceutica Inc. (collectively "Janssen"), Endo Health

Solutions Inc., and Endo Pharmaceuticals Inc. (collectively "Endo"), and Insys

Therapeutics, Inc. ("Insys") manufacture, market, and sell prescription opioid pain

medications, including the brand-name drugs OxyContin, Butrans, Hysingla ER, Actiq,

Fentora, Opana/Opana ER, Percodan, Percocet, Zydone, Nucynta/Nucynta ER,

Duragesic, and Subsys.

3.      Distributor Defendants McKesson Corporation d/b/a McKesson Drug Company,

AmerisourceBergen Drug Corporation, and Cardinal Health, Inc. distribute opioid

medications, including the medications listed above, to pharmacies, pain clinics and other

dispensaries across the country and in the City.

4.      Prescriber Defendants William Tham, Kofi Shaw-Taylor, Happiness Aguzie,

Minnie Ndem, Lawrence Vidaver, and Jackie Syme are or were engaged in medical

practice in the City or serving patients residing in or frequenting  the City when they

intentionally, unnecessarily, and/or improperly prescribed large quantities of opioids to

the citizens of or persons in  or frequenting Annapolis. Physical Medicine and Pain

Management Associates, P.C., Starlife Wellness Center LLC, Maryland Healing Waters,

LLC f/k/a Maryland Healing Waters LLC and Arundel Neurology f/k/a Arundel

Neurology, P.A. are or were located at the Prescriber Defendants' medical practices

where the subject prescribing occurred. Tormarco Harris is the owner and registered

agent for Starlife Wellness Center, LLC

5.      Prescription opioids are narcotics possessing properties similar to opium and heroin and are regulated as controlled substances. Opioids dampen the perception of pain but also can create an addictive, euphoric high. At higher doses, they can cause potentially fatal respiratory depression. Most patients receiving more than a few weeks of opioid therapy will experience often prolonged withdrawal symptoms, which may include but are not limited to anxiety, nausea, headaches, tremors, delirium, and pain, if opioid use is delayed or discontinued. When using opioids continuously, patients grow tolerant to their analgesic effects and require progressively higher doses for pain mitigation.  This increases the risks of withdrawal, addiction, and fatal or nonfatal overdose.

6.      Because of the above described dangers, opioids have historically been used cautiously and sparingly, typically only for short-term acute pain where brief use limited the need for escalating doses and the risk of addiction or for palliative end-of-life care. Consequently, the market for prescription opioids was sharply restricted.

7.      As Purdue developed OxyContin in the mid-1990s, it decided to expand its market and profits by changing the perception of opioids to permit and encourage the use of opioids long-term for widespread chronic conditions, like back pain, migraines, and arthritis. Purdue, together with Teva, Janssen, and Endo ("Manufacturing Defendants"), helped cultivate a narrative that pain was undertreated and pain treatment should be a higher priority for health care providers. This paved the way for increased prescribing of opioids for chronic pain.  Defendants began to promote opioids generally, and their own opioids in particular, as safe, effective, and appropriate for even long-term use for routine pain conditions. As part of this strategy, Defendants misrepresented the risk of addiction for pain patients as modest, manageable, and outweighed by the benefits of opioid use.

8.      Between the 1990s and 2011, prescriptions of oxycodone, an active ingredient in

opioid drugs manufactured by the Manufacturing Defendants and others, more than

doubled in the United States. During the same time period, opioid prescriptions increased

some 31% from approximately 1.6 million to approximately 2.2 million.

9.      Defendants have spent hundreds of millions of dollars on promotional activities

and materials that falsely deny or trivialize the risk of addiction and overstate the benefits

of opioids. All Defendants deceptively market opioids through advertising, websites, and /

or in-person one on one and / or group contact including but not limited to continuing

medical education ("CME") seminars, non-credit education programs, treatment

guidelines, and other publications and programs by purported patient advocacy groups,

professional associations, and physicians that were flawed and misleading, but seemed

independent and therefore credible.

10.     Through the above noted efforts, Defendants were able to persuade the public and

prescribers that the inherent addiction and other risks of opioids could be eliminated by

doctors carefully supervising their use by appropriate patients. Part of these Defendants'

message was that doctors should treat the right patients: legitimate patients who took the

drugs as directed (orally) to treat their pain, rather than abusers seeking to snort or inject

the drugs for recreation. By defining the class of individuals who should not receive

opioids as only these abusers, Manufacturing Defendants gave doctors a false sense of

security that they could safely prescribe opioids to patients they trusted without fear that

these patients would become addicted.

11.     In 2007, Purdue and three of its executives pled guilty to federal charges for

misleading doctors, patients, and regulators about the risk of addiction and OxyContin's

potential to be abused. As laid out in its plea agreement, Purdue systematically
misrepresented the risk of addiction, including promising that opioid addiction occurred in
less than 1% of patients and that opioids were not addictive when legitimately prescribed.
This was how Purdue explained away what doctors had previously believed about opioids:
it was not that opioids were not addictive, but rather opioids would not addict patients
under a doctor's care.

12.     In the decade that followed, Defendants created and sustained a multi-billion dollar
drug dealing franchise through the same pattern of deceptive marketing. Specifically,
various Defendants at various times informed and instructed doctors and patients; that
patients receiving opioid prescriptions for pain generally would not become addicted, and
that doctors could use screening tools to exclude patients who might become addicted; that
patients who did appear addicted were not; that they were, instead, "pseudoaddicted" and
needed more opioids, that opioids relieved pain when used long-term, without any studies
to support this claim and without disclosing the lack of evidence that opioids were safe or
effective long-term or the other risks from long-term use of opioids; that opioids could be
taken in higher and higher doses without disclosing the increased risk to patients, and that
the relief afforded by certain opioid formulations would last longer than it in fact could be
expected to last; and that opioids would improve patients' function and quality of life
while trivializing or omitting the many adverse effects of opioids that diminish patients'
function and quality of life among other things.

13.     Defendants knew that their representations regarding the risks and benefits of
opioids were not supported by, or were directly contrary to, the scientific evidence.

Case 1:19-cv-01162-GLR   Document 1-3   Filed 04/19/19   Page 10 of 36

14.     In addition, Purdue and Endo and other Defendants falsely promoted certain so-called abuse-deterrent opioids as preventing abuse and diversion and safe.  Defendants knew, and evidence showed, that the abuse-deterrent features of their opioids; could be easily defeated; did not affect oral use, which is the most common means of abuse; and, increased harmful outcomes, like injection or conversion to heroin. Purdue's and Endo's marketing was intended to, and did, reassure or convince prescribers who became concerned about addiction to not only continue to prescribe opioids, but also to switch to their brands of opioids, thus preserving and expanding the market for these destructive drugs.

15.     At the same time, Defendants also misrepresented their efforts to reign in the diversion and abuse of opioids, while failing to report suspicious prescribing and failing to take other appropriate action to prevent diversion and abuse of opioids. Upon information and belief, based on the reporting of an industry-wide practice, all Manufacturing Defendants paid reimbursements known as "chargebacks" to wholesale distributors, and thereby obtained information about where their drugs were going as they progressed from wholesalers to retailers and down the supply chain. Also, upon information and belief, Manufacturing Defendants also had access to detailed prescribing data, which they monitored regularly to target and monitor their marketing efforts. Upon information and belief, Manufacturing Defendants failed to report suspicious orders or retailers that the information obtained from the chargeback and prescribing data, as well as their own observations, would have revealed. Meanwhile, the rebates offered by some Defendants incentivized other Defendants to continue to supply opioids to pill mills - doctors, clinics,

or pharmacies that prescribe or dispense opioids inappropriately or for non-medical reasons – including some of the Defendants in this action.

16. Defendants' schemes were resoundingly successful. Chronic opioid therapy—the prescribing of opioids long-term to treat chronic pain—has become a commonplace, and often first-line, treatment. The above practices caused prescribing of opioids as a drug class to skyrocket. Opioids are now among the most prescribed classes of drugs. In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the U.S. While previously accounting for only a small minority of opioid sales, today 80% to 90% of opioids (measured by weight) sold are for chronic pain.

17. In 2015, Purdue reaped an estimated $2.4 billion in revenue, virtually all of it from opioids. Since its launch in 1996, OxyContin alone has generated $35 billion in sales. In the past two (2) years alone, the City of Annapolis has spent over $100,000 on Schedule II and Schedule III opioids in its employee health plan.

18. Distributor Defendants are responsible for delivering opioids marketed and made by the Manufacturing Defendants to pharmacies throughout the country. Distributor Defendants have a duty under State law to report and to not ship suspicious orders of controlled substances, including orders of opioids that exceed reasonable volume or frequency, into the City of Annapolis. Yet, Distributor Defendants have supplied opioids in quantities that they knew or should have known exceeded any legitimate market for opioids–even the wider market for chronic pain–and ignored red flags of suspicious orders of these drugs in the City. Upon information and belief, they routinely failed to do so, deepening the crisis of opioid abuse, addiction, and death in the City.

19.     As a direct result of the Defendants' conduct, the nation in general and the City in particular are now swept up in a public health epidemic and an urgent health crisis.  The increased volume of opioid prescribing has resulted in; skyrocketing addiction, overdose, and death; black markets for diverted prescription opioids; and a concomitant rise in heroin and fentanyl abuse by individuals who could no longer legally acquire—or simply could not afford—prescription opioids.   The explosion in opioid use— and Defendants' profits—has come at the expense of chronic pain patients. For the vast majority of patients, the known, serious, and too-often-fatal risks of opioids far outweigh the unproven and transient benefits.  Moreover, the cycle of addiction created by Defendants has come at a cost to the City of Annapolis; as City healthcare costs and first responder costs have increased; quality of life in the City has been adversely affected; and the City has been forced to incur costs of increased crime and lower productivity, greater child care expenses, greater welfare expenses, damage to housing and property, and other damages traceable to and caused by opioid abuse and addiction that the Defendants caused and from which the Defendants profited.  This further damage includes, but is not limited to, damage and expense to the City through: increased expenses related to employee healthcare and absenteeism; reduction in tax base; damage to quality of life in the City; increased first responder and emergency expenses, not just with respect to overdoses but also with respect to ancillary crime and situations created by victims of Defendants who became addicted as a result of their addictions; and, increased child care expenses, decreased contributions to the community and increased expenses to the City.

20.     Since 2010, opioid related overdose deaths in Maryland have more than doubled. In many, if not most, cases addiction has started with either opioids prescribed from pain

or opioids diverted from a legitimately obtained prescription. The Defendants' above-described conduct in creating and fueling this devastating cycle for their own profit has created that situation.

21.     The City of Annapolis is a municipality of the State of Maryland with the power to sue and be sued pursuant to Md. Code Ann. Local Government § 4-103.

22.     The City is the state capital of Maryland and provides many services for its residents, including public health, public assistance, and law enforcement police, fire and rescue, and emergency services.

23.     Purdue Pharma, L.P., is a limited partnership organized under the laws of Delaware. Purdue Pharma, Inc., is a New York corporation with its principal place of business in Stamford, Connecticut. The Purdue Frederick Company is a Delaware corporation with its principal place of business in Stamford, Connecticut. These Defendants are collectively referred to herein as "Purdue." Purdue manufactures, promotes, sells, and distributes opioids such as OxyContin, MS Contin, Dilaudid, and Dilaudid-HP, Butrans, and Hysingla ER in the United States and in the City. OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's annual sales of OxyContin have fluctuated between $2 billion and $3 billion. Nationwide, OxyContin constitutes roughly 25% of the entire market, by spending dollars, for prescription opioids.

24.     Teva Pharmaceuticals USA, Inc. ("Teva USA"), is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva USA acquired Cephalon in October 2011. Cephalon, Inc. ("Cephalon"), is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Teva USA and Cephalon work together closely to market and sell Cephalon products in the U.S., Maryland, Anne Arundel County and

the City. Teva USA also sells generic opioids in the United States and Anne Arundel

County, including generic opioids previously sold by Allergan plc, whose generic drug

business Teva Pharmaceutical Industries Ltd., Teva USA's parent company based in

Israel, acquired in August 2016. Teva USA and Cephalon are collectively referred to

herein as "Teva".   Teva manufactures promotes, sells, and distributes opioids such as

Actiq, a fentanyl lollipop, and Fentora, a dissolving pill, in the United States generally and

in the City.  Actiq and Fentora have been approved by the FDA only for the management

of cancer pain in patients 16 years of age and older who are already receiving, and who are

tolerant to, opioid therapy for their underlying persistent cancer pain.  In 2008, Cephalon

pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its

misleading promotion of Actiq and two other drugs, and agreed to pay $425 million as

part of its plea agreement.

25.     Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal

place of business corporation in Titusville, New Jersey, and is a wholly owned subsidiary

of Johnson & Johnson (J&J), a New Jersey corporation with its principal place of business

in New Brunswick, New Jersey. Ortho-McNeil-Janssen Pharmaceuticals, Inc., now known

as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of

business in Titusville, New Jersey. Janssen Pharmaceutica Inc., now known as Janssen

Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in

Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen

Pharmaceuticals' stock and corresponds with the FDA regarding Janssen's products. Upon

information and belief, J&J controls the sale and development of Janssen

Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. These Defendants are

collectively referred to herein as "Janssen".  Janssen manufactures, promotes, sells, and distributes drugs in the United States generally, and in the City, including the opioid called Duragesic.  Janssen opioid sales generate hundreds of millions of dollars, annually.

26.     Endo Health Solutions, Inc., is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals Inc. is a wholly-owned subsidiary of Endo Health Solutions, Inc., and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. These Defendants are collectively referred to herein as "Endo."  Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the United States generally and in the City. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 to 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the U.S. and Anne Arundel County, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc. On July 6, 2017, in response to an FDA request that Endo voluntarily withdraw the product from the market, the company announced that it would stop marketing and selling a reformulated version of Opana ER that it had marketed as an abuse-deterrent.

27.     Insys Therapeutics, Inc. ("Insys"), is a Delaware corporation with its principal place of business in Chandler, Arizona. Insys' principal product and source of revenue is Subsys, a transmucosal immediate-release formulation (TIRF) of fentanyl, contained in a single-dose spray device intended for oral sublingual administration. Subsys was approved by the FDA solely for the treatment of breakthrough cancer pain. In 2015, Insys made

approximately $330 million in net revenue from Subsys. Insys promotes, sells, and distributes Subsys throughout the United States and in the City. Insys's founder and owner, along with other Insys executives, was recently arrested and charged with multiple felonies in connection with an alleged conspiracy to bribe practitioners to prescribe Subsys and defraud insurance companies. Other Insys executives and managers were previously indicted.

28.     Cardinal Health, Inc. ("Cardinal"), describes itself as a "global, integrated health care services and products company," and is the fifteenth largest company by revenue in the United States, with annual revenue of $121 billion in 2016. Cardinal distributes pharmaceutical drugs, including opioids, throughout the country. Cardinal is an Ohio corporation and is headquartered in Dublin, Ohio. Based on Defendant Cardinal's own estimates, one of every six pharmaceutical products dispensed to U.S. patients travels through the Cardinal Health network.

29.     McKesson Corporation ("McKesson") is fifth on the list of Fortune 500 companies, with annual revenue of $191 billion in 2016. McKesson is a wholesaler of pharmaceutical drugs that distributes opioids throughout the country. McKesson is incorporated in Delaware and its principal place of business is in San Francisco, California.  In January 2017, McKesson paid a record $150 million to resolve an investigation by the United States Department of Justice ("DOJ") for failing to report suspicious orders of certain drugs including opioids, and for failing to maintain effective controls against diversion at its distribution centers including a distribution center in Landover, Maryland.

30.    AmerisourceBergen Drug Corporation ("AmerisourceBergen") is a wholesaler of

pharmaceutical drugs that distributes opioids throughout the country.

AmerisourceBergen's principal place of business is located in Chesterbrook,

Pennsylvania, and it is incorporated in Delaware.

31.    The Distributor Defendants dominate the wholesale distribution market, including

in the City. Defendants McKesson, Cardinal, and AmerisourceBergen together distribute

85% to 90% of the prescription drugs in the United States.

32.    Defendant William Tham ("Defendant Tham") is a physician licensed to practice

medicine in Maryland. Defendant Tham purports to specialize in Physical Medicine and

Rehabilitation. Defendant resides and is employed in Anne Arundel County, Maryland.

33.    Defendant Physical Medicine and Pain Management Associates, P.C. ("Defendant

PMPA") is a Maryland professional corporation with offices located in the City and Glen

Burnie, both in Anne Arundel County, Maryland. Defendant Tham founded PMPA in

1994 and is currently employed there. PMPA holds itself out as a provider of pain

management services.

34.    Defendant Physical Medicine and Pain Management Associates, P.C. ("Defendant

PMPA"), is a Maryland professional corporation with offices located in the City and Glen

Burnie, both in Anne Arundel County, Maryland. Defendant Tham founded PMPA in

1994 and is currently employed there. PMPA holds itself out as a provider of pain

management services.

35.    Defendant Kofi Shaw-Taylor ("Defendant Shaw-Taylor") was a physician licensed

in Maryland. His license was suspended by the Maryland State Board of Physicians on

May 9, 2017. Defendant Shaw-Taylor was indicted on or about August 4, 2017, for

operating two pill mills, among other charges.   Defendant Shaw-Taylor's residence is in Anne Arundel County, Maryland.

36.     Defendant Shaw-Taylor purported to practice medicine in two offices, Starlife Wellness Center in Glen Burnie, Maryland, in Anne Arundel County, and Westside Medical Group in Baltimore, Maryland. Both offices are identified as pill mills in Defendant Shaw-Taylor's indictment.

37.     Defendant Starlife Wellness Center, LLC, is a Maryland Limited Liability Company located in Anne Arundel County, Maryland. According to its Articles of Organization, its purpose is pain management.

38.     Defendant Happiness Aguzie ("Defendant Aguzie") is a certified registered nurse practitioner who was licensed in Maryland and provided medical services to patients for Defendant Starlife Wellness Center, and for Westside Medical Group in Baltimore.

39.     Defendant Tormarco Harris ("Defendant Harris") is the owner and registered agent for Starlife Wellness Center.

40.     Defendant Minnie Ndem ("Defendant Ndem") is a licensed certified registered nurse practitioner who was licensed in Maryland and provided medical services to patients at Starlife Wellness Center.

41.     Defendants Shaw-Taylor, Starlife Wellness Center, Aguzie, Harris, and Ndem are referred to collectively herein as "Starlife Defendants".

42.     Defendant Lawrence Vidaver, M.D. ("Defendant Vidaver"), is a physician licensed to practice medicine in Maryland. During all relevant times, Defendant Vidaver practiced medicine under his name and/or under the name of his medical practice, Maryland Healing Waters, LLC, f/k/a Maryland Healing Waters, LLC ("Defendant

Maryland Healing Waters"), at 1414 North Crain Highway, Suite 6A, Glen Burnie, Maryland. Defendant Maryland Healing Waters, LLC, is a Limited Liability Company. Defendant Vidaver founded Maryland Healing Waters, LLC, in or about 2011, but its charter was forfeited on October 1, 2013. Defendant Vidaver then formed Maryland Healing Waters, LLC, in 2016. Defendant Vidaver currently serves as registered agent for the company.

43.     Defendant Jackie A. Syme, Jr., M.D. ("Defendant Syme"), is a physician licensed to practice medicine in Maryland. At all times pertinent to this complaint, Defendant Syme had a private practice known as Arundel Neurology in Gambrills, Maryland. Defendant Arundel Neurology was a Maryland Professional Services Corporation founded by Defendant Syme in 2002 for the purpose of rendering physician and health care services.

44.     The venue for this claim is proper in the Circuit Court for Anne Arundel County, Maryland.

45.     This court has subject matter jurisdiction over this action.

46.     This court has personal jurisdiction over Defendant Tham, Defendant PMPA, the Starlife Defendants, Defendant Vidaver, Defendant Maryland Healing Waters, Defendant Syme and Defendant Arundel Neurology, because they are domiciled in the State of Maryland. This court has personal jurisdiction over Manufacturing Defendants, Defendant Insys, and Distributor Defendants, pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-103, because they transact business in the state of Maryland, contract to supply goods and manufactured products in the State of Maryland, carry on a continuous and systematic part of their general businesses within Anne Arundel County, Maryland, have transacted

substantial business with Anne Arundel County, Maryland, entities and residents, and have caused grave harm in Anne Arundel County, Maryland, as a result.

47.     Collectively, through misleading sales tactics designed to blind individuals to the addictive dangers of opioids, and to then profit from sales of opioids to addicts, Defendants have damaged the City as alleged above.  As set out above, those tactics included directly misleading statements, or the omission of information required to render a technically true statement that was not misleading, made to patients, healthcare providers, insurance companies and government officials, using the same tactics which included, but were not limited to: purported medical education or speaking programs; public information programs, publicity campaigns, publications or guides issued by purportedly neutral or scientific sources that were in fact controlled or financed by Defendants; campaigns to promote certain opioids for chronic pain and other non-cancer conditions for which they were not approved, appropriate, or safe; failure to adequately monitor, report, and /or follow up on, their products to insure that they were not being diverted into the illegal drug trade; and/or, direct illegal sales to addicts and/or street dealers for re-sale to addicts.

48.     Defendants' intentional illegal activities, misrepresentations, fraud, recklessness and/or negligence prompted City health care providers and others providing healthcare to City residents, employees, contractors, and/or others in, entering or affecting the City to prescribe patients to take, and payors to cover, opioids for the treatment of chronic pain. Through their continued deceptive marketing, up to and including to the present, Defendants have both benefited from and extended their prior misrepresentations, sustaining and expanding a market for their opioids. Defendants compounded these harms

by supplying opioids beyond even what this expanded market could bear, and all

Defendants knew or reasonably should have known that the volume of opioids so supplied

could only result in diversion, illicit use, addiction and the associated harms to the City

alleged herein.

49.     Defendants made, promoted, and profited from their misrepresentations about the

risks and benefits of opioids for chronic pain, even though they knew that their marketing

was false and misleading. The history of opioids, as well as research and clinical

experience over the last 20 years, established that opioids were highly addictive and

responsible for a long list of very serious adverse outcomes. Defendants had access to

scientific studies, detailed prescription data, and reports of adverse events, including

reports of addiction, hospitalization, and deaths—all of which made clear the harms from

long-term opioid use and that patients are suffering from addiction, overdoses, and death

in alarming numbers. More recently, the Federal Food and Drug Administration ("FDA")

and the Center for Disease Control ("CDC") have issued pronouncements based on

existing medical evidence that conclusively expose the known falsity of these Defendants'

misrepresentations.  Notwithstanding this knowledge, at all times relevant to this

Complaint, Defendants took steps to avoid detection of, and to fraudulently conceal, their

deceptive marketing and illegal, unlawful, unfair, and fraudulent conduct, their negligence

and their recklessness. Defendants disguised their own role in the deceptive marketing of

chronic opioid therapy by funding and working through biased science, unbranded

marketing, third-party advocates, and professional associations. Defendants also distorted

the meaning or import of studies cited and offered to them, and used them to publish false

information, and purports to establish them as evidence for propositions the studies did not support.

50.     Defendants thus successfully concealed from the medical community, patients, and the City facts sufficient to arouse suspicion of the claims that the City now asserts. The City did not know of the existence or scope of these Defendants' fraud, misrepresentation, gross recklessness/negligence, or negligence, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

### CAUSES OF ACTION

### COUNT I

### PUBLIC NUISANCE

51.     The City incorporates the allegations within all prior paragraphs in this Complaint as if they were fully set forth herein.

52.     Defendants, individually and acting through their employees and agents, and in concert with each other, have as set forth above intentionally, recklessly, and/or negligently engaged in conduct or omissions that endanger or injure the property, health, safety or comfort of the public in the City of Annapolis by their production, promotion, marketing, prescribing and sale of opioids for use by residents of Annapolis, employees of the City of Annapolis, or others entering into or affecting Annapolis.

53.     Defendants' acts and omissions offend, significantly and unreasonably interfere with, and cause damage to the public rights common to all as alleged above, including but not limited to public health, public safety, public peace, and public comfort. Defendants had control over their conduct in and affecting the City of Annapolis, and that conduct has had an adverse effect on the public right. The public nuisance caused by Defendants has

significantly harmed the City and a considerable number of City residents, employees of the City of Annapolis, or others entering into or affecting Annapolis, and otherwise damaged the City as set forth herein.

54.     Defendants' conduct is not insubstantial or fleeting. It has caused deaths, serious injuries, and a severe disruption of public peace, health, order and safety; it is ongoing, and it is producing permanent and long-lasting damage, and has damaged the City in ways different from the public at large, as alleged and set forth herein.

       **WHEREFORE**, the City demands judgment in its favor against the Defendants for compensatory and punitive damages in an amount to be determined by a jury, but not less than $50,000,000, and injunctive relief together with all the costs of this action, including prejudgment interest, post-judgment interest, costs and expenses, attorney fees, and such other relief as this Court deems just and equitable.

## COUNT II

### MARYLAND ANTITRUST ACT

55.     The City incorporates the allegations within all prior paragraphs in this Complaint as if they were fully set forth herein.

56.     The various agreements between various Defendants to market, distribute, sell and promote their opioid products, as alleged above, constitute agreements, contracts or conspiracies between two or more legal persons.

57.     These agreements, contracts or conspiracies involve as their ultimate goal distribution of addictive opioids into society, causing the damages alleged above to the City, and as such are unreasonable.  Indeed, these agreements lack remedial virtue and have such an adverse effect on trade that they are conclusively unreasonable in and of

themselves without further elaborate inquiry into the precise harm that they cause or the business excuse for their use.

58.     These agreements harm trade and commerce, in that individuals become addicted to opioids and thus unable to control their actions or cease use of opioids, leading to the damages alleged herein.  Trade and commerce in the legitimate healthcare markets, housing markets and other markets are harmed in that: healthcare becomes more expensive for payors such as the City, and in that addicts and their dependents require more services, otherwise unnecessary services and more expensive services; and, property becomes damaged and more citizens are impacted by crime, decreasing value of property and services in the City and imposing greater first responder costs on the City.  These and all other services the City provides and markets in which the City is a consumer have costs that are increased by the opioid epidemic caused by Defendants' unreasonable agreements, combinations and conspiracies to market, sell and distribute dangerously addictive opioids.

59.     Accordingly, Defendants' unreasonable agreements, combinations and conspiracies violate Section 11-204(a)(1) of the Maryland Antitrust Act.

**WHEREFORE,** the City demands judgment in its favor against the Defendants for compensatory and punitive damages in an amount to be determined by a jury, but not less than $50,000,000, and injunctive relief together with all the costs of this action, including prejudgment interest, post-judgment interest, costs and expenses, attorney fees, and such other relief as this Court deems just and equitable.

## COUNT III

## MARYLAND FALSE CLAIMS ACT

60.     The City incorporates the allegations within all prior paragraphs in this Complaint as if they were fully set forth herein.

61.     Maryland General Provisions § 8-102 provides that a person may not, "knowingly present or cause to be presented a false or fraudulent claim for payment or approval; (2) knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim; (3) conspire to commit a violation under this title;...or (9) knowingly make any other false or fraudulent claim against a governmental entity."

62.     Pursuant to Maryland General Provisions § 8-101(e)(3), the City is a "governmental entity" as that term is used in §8-102.

63.     Defendants' practices, upon information and belief, as described in this Complaint, violated Maryland General Provisions § 8-102. Defendants, through their deceptive marketing of opioids for chronic pain, and/or intentional overprescribing of opioids and other conduct as alleged herein: knowingly made, or caused to be made, false or fraudulent claims to the City and/or its agents; knowingly made or caused to be made or used false statements material to such claims; and, conspired to cause such false or fraudulent claims and statements to be made to the City and/or its agents.

64.     Upon information and belief, Defendants knew, deliberately ignored, or recklessly disregarded, at the time of making or disseminating these false statements, or causing these false statements to be made or disseminated, that such statements were untrue, false, or misleading or contained material omissions and were made for the purpose of getting the City, and persons in or from the City to pay for opioids for long-term treatment of chronic pain. In addition, Defendants knew, deliberately ignored, or recklessly disregarded, that their marketing and promotional efforts created an untrue, false, and

misleading impression about the risks, benefits, and superiority of opioids for chronic pain.

65.     Defendants knew that the doctors, pharmacists, other health care providers, and/or employees, and agents of the City to whom they deceptively marketed prescription opioids had treated and would continue to treat patients whose prescription costs were paid or reimbursed by the City health plan and City workers' compensation claims, and that the result of generating the opioid epidemic through opioid addiction caused by their activities alleged above would be the damages alleged above to the city.  Defendant Prescribers knew that the costs of their unnecessary, excessive, and fraudulent opioid prescriptions would be paid or reimbursed through a City health plan or workers' compensation claims and cause other damages to the City as alleged above.

66.     Defendants knew, deliberately ignored, or recklessly disregarded that, as a natural consequence of their actions, governments such as the City would necessarily be paying for long-term prescriptions of opioids to treat chronic pain, which were dispensed because of Defendants' fraud, misrepresentations, gross negligence, or negligence. Indeed, Defendants acted to maximize their reimbursements from these third-party payors.

67.     Defendants' misrepresentations and omissions were material.

68.     By virtue of the above-described acts, Defendants knowingly and willfully made, used or caused to be made, false statements or representations and deliberately concealed material facts, to induce the City to provide benefits, payments, or reimbursements.

69.     The City has paid, and continues to pay for reasons explained above, claims that would not be paid but for Defendants' false claims and statements, misrepresentations of material fact, or omission of material facts.

70.     But for Defendants' false statements, the false claims at issue would not have been submitted for payment and would not have been paid by the City.

71.     Because Manufacturing Defendants' unbranded marketing caused doctors to prescribe and the City to pay for long-term opioid treatment using opioids manufactured or distributed by other drug makers, Defendants caused and are responsible for those costs and claims as well.

72.     By reason of Defendants' unlawful acts, the City has been damaged, and continues to be damaged in a substantial amount to be determined at trial.

    **WHEREFORE,** the City demands judgment in its favor against the Defendants for compensatory and punitive damages in an amount to be determined by a jury, but not less than $50,000,000 and injunctive relief together with all the costs of this action, including prejudgment interest, post-judgment interest, costs and expenses, attorney fees, and such other relief as this Court deems just and equitable.

## COUNT IV

### MARYLAND CONSUMER PROTECTION ACT ("CPA")

73.     The City incorporates the allegations above as if they were fully set forth herein.

74.     Defendants have violated Maryland's CPA because, as set forth in the allegations herein, they have engaged in unfair or deceptive trade practices, including deception, fraud, misrepresentation, or the knowing concealment or omission of material facts in the sale and promotion of a consumer good.

75.     Specifically, as set out above, and generally Defendants have engaged in misrepresentations, deception, and knowing omissions of material fact violated Maryland's CPA in; overstating the benefits of and evidence for the use of opioids for

chronic pain and understating their very serious risks, including the risk of addiction; in disseminating misleading information regarding the appropriateness of their opioids for certain conditions; in falsely promoting abuse-deterrent formulations as reducing abuse; in making false claims regarding the time and level of pain relief provided; and, in falsely portraying their efforts or commitment to reign in the diversion and abuse of opioids,.

76.     By engaging in the acts and practices alleged above, Defendants omitted to state material facts, with the intent that others would rely on their omissions or suppression of information, that they had a duty to disclose by virtue of Defendants' other representations.

77.     The City of Annapolis, as a legal entity, is part of the broad class of persons that may avail themselves of a remedy under Md. Code Ann., Com. Law § 13-101(h).

78.     The City has been injured as a direct and proximate result of Defendants' violations of the Consumer Protection Act as alleged in this Complaint.

**WHEREFORE,** the City demands judgment in its favor against the Defendants for compensatory and punitive damages in an amount to be determined by a jury, but not less than $50,000,000, and injunctive relief together with all the costs of this action, including prejudgment interest, post-judgment interest, costs and expenses, attorney fees, and such other relief as this Court deems just and equitable.

## COUNT V

### FRAUDULENT MISREPRESENTATION

79.     The City incorporates the allegations above as if they were fully set forth herein.

80.     As set forth herein, Defendants, individually and acting through their employees and agents, made misrepresentations and omissions of material facts inducing the

purchase, administration, payment for, and consumption of opioids as set forth in detail above.

81.    In doing so, Defendants have engaged in misrepresentations and knowing omissions of material fact.

82.    By engaging in the acts, omissions, and practices alleged herein, Defendants omitted material facts that they had a duty to disclose by virtue of Defendants' other representations and by virtue of their positions in manufacturing, marketing, selling, and distributing dangerous opioid drugs.

83.    Defendants' statements about the use of opioids to treat chronic pain and/or non-cancer pain conditions were false and not supported by, or were contrary to, the scientific evidence.

84.    Further, Defendants' omissions, which were false and misleading, rendered even seemingly truthful statements about opioids false and misleading and likely to mislead City prescribers and consumers.

85.    Defendants knew at the time that they made their misrepresentations and omissions that they were false.

86.    Defendants intended that the City and its residents and / or employees or others affecting the City or spending time therein would rely on their misrepresentations and omissions, knew that the City and its residents would rely on their misrepresentations, and that such reliance would cause the City to suffer loss.

87.    Healthcare providers and residents in the City and / or employees or others affecting the City or spending time therein reasonably relied on Defendants' misrepresentations and omissions in writing, filling, and using prescriptions for

Defendants opioids, and the City and its agents reasonably relied on these misrepresentations and omissions in covering and paying for Defendants' opioids for chronic pain.

88.      Had the City known of the Defendants' misrepresentations and false and tortious practices, the City would have undertaken efforts to avoid payments of related claims or otherwise acted to mitigate or prevent damage.

89.      By reason of their reliance on Defendants' misrepresentations and omissions of material fact the City suffered actual pecuniary damage.

90.      Defendants' conduct was accompanied by wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

**WHEREFORE,** the City demands judgment in its favor against the Defendants for compensatory and punitive damages in an amount to be determined by a jury, but not less than $50,000,000, and injunctive relief together with all the costs of this action, including prejudgment interest, post-judgment interest, costs and expenses, attorney fees, and such other relief as this Court deems just and equitable.

## COUNT VI

### NEGLIGENT MISREPRESENTATION

91.      The City incorporates the allegations above as if they were fully set forth herein.

92.      Defendants, individually and acting through their employees and agents, and jointly and severally, made misrepresentations and omissions of facts material to Plaintiff and its residents to induce them to purchase, administer, and consume opioids as set forth in detail herein.

93.     Defendants had a duty to exercise reasonable care in marketing and selling highly dangerous opioid drugs.

94.     Defendants negligently asserted false statements and omitted material facts regarding the benefits of and evidence for the use of opioids for chronic pain as set forth herein, while understating their very serious risks, including the risk of addiction.

95.     Defendants intended that the City and its residents and / or employees or others affecting the City or spending time therein would rely on their misrepresentations and omissions, knew that the City and its residents would rely on their misrepresentations, and that such reliance would cause the City to suffer loss.

96.     Healthcare providers and residents in the City reasonably relied on Defendants' misrepresentations and omissions in writing, filling, and using prescriptions for Defendants opioids, and the City and its agents reasonably relied on these misrepresentations and omissions in covering and paying for Defendants' opioids for chronic pain.

97.     Had the City known that Defendants misrepresented the risks, benefits, and evidence regarding the use of opioids for chronic pain the City would have undertaken efforts to avoid the damages suffered.

98.     By reason of Defendants' misrepresentations and omissions of material fact the City suffered actual pecuniary damage.

99.     Defendants' conduct was accompanied by wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

**WHEREFORE,** the City demands judgment in its favor against the Defendants for compensatory and punitive damages in an amount to be determined by a jury, but not less

than $50,000,000 and injunctive relief together with all the costs of this action, including prejudgment interest, post-judgment interest, costs and expenses, attorney fees, and such other relief as this Court deems just and equitable.

### COUNT VII

### NEGLIGENCE

100.     The City incorporates the allegations above as if they were fully set forth herein.

101.     Defendants have a duty to exercise reasonable care in manufacturing, marketing, selling, and distributing highly dangerous opioid drugs in the City of Annapolis and to the citizens or employees thereof and / or others affecting the City or spending time therein.

102.     Defendants have a duty to exercise reasonable care under the circumstances. This includes a duty not to cause foreseeable harm to others. In addition, these Defendants, having engaged in conduct that created an unreasonable risk of harm to others, had, and still have, a duty to exercise reasonable care to prevent said harm.

103.     Defendants are part of a limited class of registrants authorized to legally market, sell, and distribute controlled substances, which places them in a position of great trust and responsibility vis-a-vis the City. Their duty cannot be delegated.

104.     In addition, Defendants each had a duty under Maryland law, which incorporates the federal Controlled Substances Act, to maintain effective controls against diversion of prescription opioids, to report suspicious orders of opioids, and not to fill suspicious orders unless and until due diligence had eliminated the suspicion.

105.     Upon information and belief, each of these Defendants repeatedly breached its duties.

106.    The foreseeable harm from a breach of these duties is the sale, use, abuse, and diversion of prescription opioids, addiction, morbidity and mortality in the City's communities, damage to quality of life in the City, increased costs for first responders, City social services, City housing, and City healthcare costs, and other damages to the City as alleged herein.

107.    Reasonably prudent manufacturers and distributors of prescription opioids would have anticipated that the scourge of opioid addiction would wreak havoc on communities and the significant costs that would be imposed upon the governmental entities associated with those communities. It is a violation of law for Defendants not to report suspicious opioid orders and exercise due diligence in not shipping such orders unless and until the suspicion has been removed. The closed system of opioid distribution whereby Defendants are the gatekeepers, and wherein all links in the chain have a duty to prevent diversion, exists for the purpose of controlling dangerous substances such as opioids and preventing diversion and abuse to prevent precisely these types of harms.

108.    Reasonably prudent persons in Defendants' circumstances would know that aggressively marketing highly addictive opioids and failing to exercise due diligence in the monitoring of orders or prescriptions for same would result in the severe harm of addiction, foreseeably causing the harms alleged in this Complaint.

109.    The City seeks economic losses (direct, incidental, or consequential pecuniary losses) to the City resulting from the negligence of Defendants. It does not seek damages which may have been suffered by individual citizens of the City for wrongful death, physical personal injury, serious emotional distress, or any physical damage to property which are recoverable by individuals.

Case 1:19-cv-01162-GLR   Document 13   Filed 04/16/19   Page 34 of 36

110.    These Defendants' breach of the duties described in this Count directly and proximately resulted in the injuries and damages alleged by the City.

**WHEREFORE,** the City demands judgment in its favor against the Defendants for compensatory and punitive damages in an amount to be determined by a jury, but not less than $50,000,000, and injunctive relief together with all the costs of this action, including prejudgment interest, post-judgment interest, costs and expenses, attorney fees, and such other relief as this Court deems just and equitable.

### COUNT VIII

### UNJUST ENRICHMENT

111.    The City incorporates the allegations above as if they were fully set forth herein.

112.    As an expected and intended result of their wrongdoing as set forth in this Complaint, Defendants have profited and benefited from opioid sales which have ultimately caused damage to the City as alleged above.

113.    Defendants have been unjustly enriched at the expense of the City. It would be inequitable for Defendants to retain the profits and benefits they have reaped from the deceptive practices, misrepresentations, and unlawful conduct alleged herein.

**WHEREFORE,** the City demands judgment in its favor against the Defendants for compensatory and punitive damages in an amount to be determined by a jury, but not less than $50,000,000, and injunctive relief together with all the costs of this action, including prejudgment interest, post-judgment interest, costs and expenses, attorney fees, and such other relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all issues triable by jury in this matter.

February 26, 2019                          Respectfully submitted,

                                 /s/ F. Joseph Gormley
                                F. Joseph Gormley
                                CPF No.: 9312140289
                                fjgormley@gjblawfirm.com

                                 /s/ Paul H. Farmer, Jr.
                                Paul H. Farmer, Jr.
                                CPF No.: 1412160254
                                pfarmer@gjblawfirm.com

                                 /s/ Frank P. Lozupone, III
                                Frank P. Lozupone, III
                                CPF No.: 1612140054
                                flozupone@gjblawfirm.com

                                GORMLEY JARASHOW BOWMAN, LLC
                                162 West Street
                                Annapolis, MD 21401
                                Tel: 410-268-2255
                                Fax: 443-782-0241

                                *Attorneys for Plaintiff*

## REQUEST FOR WRIT OF SUMMONS

Plaintiffs respectfully request that the Clerk issue a Writ of Summons for Service on Defendants, Purdue Pharma, L.P., Purdue Pharma, Inc., The Purdue Frederick Company, Teva Pharmaceuticals USA, Inc., Cephalon, Inc., Johnson & Johnson, Janssen Pharmaceuticals, Inc.; Ortho-Mcneil-Janssen Pharmaceuticals, Inc., n/k/a/ Janssen

Case 1:19-cv-01162-GLR Document 1-3 Filed 04/19/19 Page 36 of 36

Pharmaceuticals, Inc.; Janssen Pharmaceutica, Inc., n/k/a Janssen Pharmaceuticals, Inc.,

Endo Health Solutions, Inc., Endo Pharmaceuticals, Inc., Insys Therapeutics, Inc., Cardinal

Health, Inc., McKesson Corporation, Amerisourcebergen Drug Corporation, William

Tham, M.D., Physical Medicine and Pain Management Associates, P.C., Kofi Shaw-

Taylor, Happiness Aguzie, Tormarco Harris, Minnie Ndem, Stalife Wellness Center, LLC,

Lawrence Vidaver, M.D., Maryland Healing Waters, LLC f/k/a Maryland Healing Water

LLC, and that the Summons be directed to Plaintiff's counsel.


   /s/ Frank P. Lozupone, III
Frank P. Lozupone, III